UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 12-21224-CIV-MORENO

LIVAN MARTIN DIAZ and JAVIER
FIGUEROA VILLASUSO,

      Plaintiffs,

vs.

U.S. CENTURY BANK, INTERNATIONAL
RISK RESPONSE, INC., and JOSE ANTONIO
QUIJANO,

      Defendants.

_____/

## ORDER GRANTING DEFENDANT U.S. CENTURY BANK'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Livan Diaz and Javier Villasuso were hired as security officers by Defendant International Risk Response, Inc. ("IRR"). They have filed suit against Defendant U.S. Century Bank for alleged violations of the Fair Labor Standards Act ("FLSA"). The FLSA imposes minimum wage and maximum hours requirements on employers. Because the Court finds that U.S. Century Bank was not Plaintiffs' joint employer under the FLSA, summary judgment in favor of Defendant U.S. Century Bank is granted while Plaintiffs' motion for partial summary judgment is denied.

## I. FACTUAL BACKGROUND[1]

Defendant IRR operated a security service that provided security officers and related services to its clients. These clients included a condominium, a supermarket chain, and

_____

[1] The following factual summary includes only those facts not in dispute.

Defendant Century Bank. On February 3, 2010, IRR entered into a vendor agreement with
Century Bank to provide security officers at the bank's various branches, including the bank's
headquarters in Doral, Florida. This agreement provided that "[a]ll work performed by IRR in
connection with the material, software, or Services described [therein] . . . [would] be performed
by [IRR] as an independent contractor and not as the agent or employee of [the] Bank." Estevan
Decl. Ex. A. Additionally, the agreement provided that "[a]ll persons furnished by [IRR]
[would] be for all purposes solely [IRR's] employees or agents and [would] not be deemed to be
employees of [the] Bank for any purpose whatsoever." *Id.*

Regarding the details of IRR's contractual obligations, the agreement stated that IRR
would provide a uniformed security officer at all locations desired by Century Bank at a schedule
set by the bank. IRR would bill Century Bank for these services at an hourly rate, providing the
bank with an invoice that the bank would pay at a later time. Finally, IRR was responsible for
the assignment of each officer to a specific location and retained the right to rotate officers to
different locations at its discretion. Nevertheless, Century Bank had the authority to both request
the assignment of a particular officer at a specific location as well as to override IRR's discretion
and refuse the assignment of a particular officer at any of its branches.

Accordingly, IRR invoiced Century Bank for every hour logged by the security officers at
the Doral location. The bank would then pay IRR for these services. Apart from the invoices
and their attached time sheets, Century Bank never created or maintained any employment
records for any security officer that worked at the Doral branch. Significantly, the bank did not
own the facilities at its Doral location but rather leased certain floors from the building's owner.
In fact, employees and customers of other businesses located in the building often used the

-2-

parking lot and garage next to Century Bank's facilities.

### A. Employment of Plaintiff Villasuso

In early 2010, Defendant Quijano, IRR's owner and president, interviewed and hired Plaintiff Villasuso as a security officer. Quijano told Villasuso how much IRR would pay him and that Villasuso would receive payment by check directly from IRR. In addition, Quijano gave Villasuso a company identification card and patches bearing the IRR symbol to be worn on a uniform that Quijano required Villasuso to wear. This uniform never contained any reference to Century Bank.

Following his hiring, IRR assigned Villasuso to work at Century Bank's Doral location beginning on February 8, 2010. Quijano informed Villasuso of the starting date, where Villasuso would stand in the bank, and details on how Villasuso would keep track of his hours. Specifically, Villasuso would record his hours on a time sheet created by IRR. A representative of Century Bank would then review and sign the sheet every fifteen days. Lastly, Quijano notified Villasuso of the days and hours that he would work.

On his first day at the bank, Villasuso met with Quijano and Linda Torres, the branch manager of Century Bank's Doral location. Torres at this time gave Villasuso specific instructions on his duties. She required him to be present from 7:30 a.m. to the closing of the bank; directed him to sit, stand, and eat lunch at specific times; and instructed him to greet and bid farewell to all customers. If he encountered anything suspicious, Torres wanted Villasuso to inform bank personnel immediately. Furthermore, she told Villasuso to consult with the receptionist before taking lunch and forbade him from leaving at night until after bank employees had placed the money in the safe.

-3-

Villasuso continued to follow these instructions throughout his time working inside the bank. Each day, a bank employee would inform Villasuso when the money was placed in the safe so that Villasuso could leave for the night. On a few occasions, a bank employee would tell Villasuso to ask a customer to remove a hat or sunglasses. Additionally, as Century Bank sporadically expected a client after hours, a bank employee would inform Villasuso of the client's identity so Villasuso could let him or her in the building. When Villasuso took days off, he would let Torres know in advance and would provide her with the name of his substitute. However, IRR alone determined which officer would replace Villasuso. And pursuant to Quijano's instructions, Torres or another Century Bank employee would sign Villasuso's time sheet every fifteen days.

Villasuso continued to work at Century Bank's Doral location until Quijano fired him on October 31, 2011. During this period, Villasuso held no other position of employment.

### B. Employment of Plaintiff Diaz

In June 2009, Quijano hired Plaintiff Diaz to work as a security officer at a condominium. Because Quijano required Diaz to have a security-officer license for the position, Diaz took training classes to acquire the license prior to being hired. As with Villasuso, Quijano provided Diaz with an IRR identification card and patches bearing the IRR symbol to wear on his uniform. Quijano also gave Diaz the same IRR time sheets to record his hours.

In June 2010, IRR assigned Diaz to work at Century Bank's Doral location, specifically stationing him outside the bank and in the parking area. Quijano told Diaz how much IRR would pay him as well as the days and hours that he would work at the bank. On June 26, 2010, Diaz met with Quijano, Century Bank Senior Vice President Manuel David Lopez, and bank employee

Duniesky Estevan.  Lopez and Estevan notified Diaz that he would need to watch over the third floor of the parking lot on Wednesdays due to a weekly executive meeting.  Diaz eventually worked in both the parking lot as well as the first floor of the building.

Throughout Diaz's time at Century Bank, Estevan monitored all areas of the Doral branch via camera, including those areas to which Diaz was assigned.  Though the precise degree of daily supervision is unclear from the record, Century Bank at the very least instructed Diaz on occasion to go to different locations on the premises when bank employees noticed something out of the ordinary.  Such instances included the presence of a solicitor or an illegally parked car.  And as noted, Diaz maintained a post on the third floor of the parking lot on Wednesdays for the weekly executive meeting.  Moreover, no bank employee ever disciplined Diaz during his employment.

In early 2011, Diaz began attending English classes.  To assist Diaz, Quijano adjusted Diaz's schedule to permit him to leave the bank early to make his class.  Over the four-month period in which Diaz left work early to attend class, he never sought, and did not need to seek, permission from any Century Bank employee.

Diaz continued to work at Century Bank's Doral location until Quijano fired him on October 31, 2011.  During this period, Diaz held no other position of employment.

### C.  FLSA Lawsuit

Plaintiffs filed the present suit asserting three claims under the FLSA against Century Bank, IRR, and Quijano.  Specifically, Plaintiffs sought recovery of unpaid overtime wages in Count I from all three Defendants.  In Counts II and III, each Plaintiff respectively submitted a claim for retaliatory discharge against IRR and Quijano.  Century Bank subsequently terminated

its relationship with IRR in July 2012.

Century Bank filed the present motion for summary judgment on February 2, 2013 contending that it was not Plaintiffs' joint employer under the FLSA. Plaintiffs thereafter filed a motion for partial summary judgment arguing that Century Bank was their joint employer according to the Act.

## II. LEGAL STANDARD

A court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Consequently, the movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In evaluating whether the movant has met this burden, a court must view all the evidence in the light most favorable to the non-moving party. *See Dent v. Giaimo*, 606 F. Supp. 2d 1357, 1359 (S.D. Fla. 2009) (citing *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983)). This means that a court "must construe all facts and draw all reasonable inferences in favor of the non-moving party." *Id.*

Once the movant has met its burden under Rule 56, the burden of production shifts and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, "mere conclusory, uncorroborated allegations by a [non-moving party] in an

affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment." *Dent*, 606 F. Supp. 2d at 1359.  Rather, the non-moving party must come forward with "specific facts showing a genuine issue for trial" or the court will grant summary judgment.  *See Lopez v. Ans*, No. 09-60734-CIV-COHN/SELTZER, 2010 U.S. Dist. LEXIS 7543, at *9 (S.D. Fla. Jan. 29, 2010) (quoting *Matsushita*, 475 U.S. at 587).  A genuine issue of material fact does not exist "unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III. DISCUSSION

In its motion for summary judgment, Century Bank urges the Court to find as a matter of law that it was not Plaintiffs' joint employer under the FLSA.  Plaintiffs in turn present their motion for partial summary judgment seeking the opposite conclusion.

Section 203(d) of the FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d) (2013).  An entity "employs" a person under the FLSA if it "suffer[s] or permit[s]" the individual to work. *Id.* § 203(g).  In determining whether a particular entity employed an individual, a court must ask "if, as a matter of economic reality, the individual is dependent on the entity." *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996).  This "economic realities test" therefore looks at the "surrounding circumstances of the whole activity" to ascertain whether the person was dependent upon the putative employer. *Beck v. Boce Grp., L.C.*, 391 F. Supp. 2d 1183, 1186 (S.D. Fla. 2005).

In addition, the FLSA recognizes that "a worker can be economically dependent on, and

thus jointly employed by, more than one entity at the same time." *Antenor*, 88 F.3d at 929. Accordingly, "whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case." 29 C.F.R. § 791.2(a) (2013). The Eleventh Circuit specifically employs eight factors in analyzing whether a joint employment relationship exists: (1) the nature and degree of the putative employer's control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the right, directly or indirectly, to hire, fire, or modify the workers' employment conditions; (4) the power to determine the workers' pay rates or methods of payment; (5) the preparation of payroll and payment of the workers' wages; (6) the ownership of the facilities where the work occurred; (7) whether the workers performed a line job integral to the end product; and (8) the relative investment in equipment and facilities. *Beck*, 391 F. Supp. 2d at 1187.

Furthermore, the Eleventh Circuit has provided a few underlying principles to guide the execution of this analysis. First, the inquiry in joint employment cases is "not whether the worker is more economically dependent on the independent contractor or the [alleged employer], with the winner avoiding responsibility as an employer." *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1177 (11th Cir. 2012) (quoting *Antenor*, 88 F.3d at 932). Rather, the court must concentrate on "each employment relationship as it exists between the worker and the party asserted to be a joint employer." *Id.* (quoting *Antenor*, 88 F.3d at 932). Second, no one factor is determinative as the existence of a joint employment relationship depends on the economic reality of all the circumstances. *Antenor*, 88 F.3d at 932. Third, economic dependence is the ultimate notion that must direct the court's decision and "the weight of each factor depends on

the light it sheds on the []workers' economic dependence (or lack thereof) on the alleged

employer, which in turn depends on the facts of the case." *Id.* at 932–33. Fourth, the joint

employment analysis is "not determined by a mathematical formula." *Id.* at 933. The absence of

any one or more of the factors does not preclude a finding of joint employment. *Id.* Indeed,

"[t]he purpose of weighing the factors is . . . to view them qualitatively to assess the evidence of

economic dependence, which may point to both" putative employers. *Id.* Fifth, the court "must

not allow common-law concepts of employment to distract [its] focus from economic

dependency." *Id.* Last, the FLSA as a remedial statute should be construed broadly. *Beck*, 391

F. Supp. 2d at 1187.

  The Court will now proceed to evaluate Plaintiffs' and Century Bank's competing claims

under each of the eight factors. In doing so, the Court first takes note of the Eleventh Circuit's

decision in *Layton v. DHL Express (USA), Inc.* In that case, DHL, a provider of shipping and

logistic services, contracted with a third party, Sky Land Express, for the use of drivers to deliver

DHL's packages. *Layton*, 686 F.3d at 1173. Utilizing the joint employment analysis, the court

concluded that DHL was not a joint employer of the drivers under the FLSA. *See id.* at 1181. In

particular, the court held that DHL did not exercise sufficient control over the drivers despite the

fact that it made business decisions and received erratic pick-up orders that occasionally affected

the length of the drivers' workdays. *See id.* at 1178. Additionally, the court found that DHL did

not exercise enough supervision over the drivers to qualify as a joint employer even though DHL

managers oversaw the loading of packages by the drivers every morning, audited the drivers'

vehicles, and periodically checked in with the drivers via scanners. *See id.* at 1179. Finally, the

court emphasized the fact that DHL had no power to hire or fire the drivers, had no power to set

pay rates, did not pay the drivers, did not own the drivers' vans, and did not employ the drivers in a specialty job integral to its business. *See id.* at 1179–80. In reaching its conclusion, the court did not find the final factor, investment in equipment and facilities, to be dispositive as both Sky Land and DHL made significant investments in the drivers' equipment and facilities. *See id.* at 1181.

### A. Joint Employment Analysis

#### 1. Nature and Degree of Century Bank's Control of Plaintiffs

As the Eleventh Circuit stated in *Layton*, "[c]ontrol arises . . . when the [purported joint employer] goes beyond general instructions . . . and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." *Id.* at 1178 (quoting *Aimable v. Long & Scott Farms*, 20 F.3d 434, 441 (11th Cir. 1994)). A purported employer takes an overtly active role in the oversight of work when it decides such things as "(1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained." *Id.* (quoting *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209–10 (11th Cir. 2003)).

In its motion for summary judgment, Century Bank asserts that it lacked sufficient control over Plaintiffs to qualify as their joint employer. First, the bank argues that it only provided Plaintiffs with general instructions regarding their duties. It contends that it never gave regular instructions to Villasuso after Torres spoke with him on his first day and never provided Diaz with further instructions unless something out of the ordinary happened. Furthermore, Century Bank equates its regulation of Villasuso's work hours to DHL's indirect control of the drivers'

hours in *Layton*.  Namely, Century Bank urges the Court to deem its fixture of Villasuso's hours

to the closing of the safe as too abstract, just as the Eleventh Circuit held in relation to the impact

of DHL's business decisions on the drivers' hours.  Lastly, though Century Bank admits that it

contracted for the presence of security officers for certain hours at its Doral location, it stresses

that it did not negotiate for the presence of specific officers such as Plaintiffs on its premises.

Instead, the bank points out that Plaintiffs worked out their schedules with IRR and that IRR

made the decision to send Plaintiffs to work at Century Bank.   In fact, IRR had the authority to

assign Plaintiffs to work for other clients if it so desired and controlled the assignment of

substitutes for Plaintiffs.

In response, Plaintiffs first assert that Century Bank exercised sufficient control over

them.  For instance, Plaintiffs claim that Century Bank set up their management structure by

having Torres and Estevan assign specific tasks to Villasuso and Diaz respectively.  To this end,

they note that Torres instructed Villasuso on his duties during his first day while Estevan

assigned Diaz to work on the third floor of the parking lot on Wednesdays at the onset of his time

at the bank.  Moreover, Plaintiffs point to the provisions in the vendor agreement reserving

Century Bank's right to request or reject the presence of specific officers and granting it the

authority to designate the officers' hours.  Beyond the agreement, Plaintiffs assert that the bank

exercised further control over Villasuso's hours by tying the end of his workday to the closing of

the safe.

Despite Plaintiffs' arguments to the contrary, the Court finds from the undisputed facts

that the first factor weighs against a finding of joint employment.  To begin, the Court does

acknowledge that Century Bank may have exercised a certain amount control over Plaintiffs'

hours. In *Layton*, DHL merely set the time for drivers to pick up packages in the morning, leaving the drivers in control of the length of their workdays based on their delivery of the packages. *See id.* DHL only occasionally affected the duration of the drivers' workdays when it had erratic pick-up orders to which drivers had to respond. *Id.* In contrast, Century Bank here set the start and end times for both Villasuso and Diaz. Though Villasuso's end time varied based upon the closing of the safe, that was still a set event set in place by Century Bank.

Nevertheless, Century Bank failed to exert much control beyond its regulation of Plaintiffs' hours. Century Bank largely did not direct Plaintiffs beyond providing them with general instructions during their time at the bank. In particular, Bank representatives informed Plaintiffs of their general tasks on their respective first days, but only sporadically provided Plaintiffs with any sort of specific instructions afterward. Century Bank thus did not actively and overtly involve itself in Plaintiffs' specific tasks on a constant basis.

Moreover, Century Bank did not exercise any control over the specific assignment of Plaintiffs. IRR alone made the choice to assign Plaintiffs in particular to work at Century Bank from amongst their various clients. IRR alone made the determination of who would substitute for Plaintiffs when they took days off of work. And IRR alone adjusted Diaz's schedule for four months to allow him to attend English classes. In light of these facts, the Court concludes that the limited control that Century Bank did exercise over Plaintiffs was akin to the "abstract" control that the Eleventh Circuit found lacking in *Layton*. *See id.*

2. Century Bank's Degree of Supervision of Plaintiffs' Work

A putative employer may exercise supervision "regardless of whether orders are communicated directly to the alleged employee or indirectly through the contractor." *Id.* at

-12-

1178–79. However, "infrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Martinez-Mendoza*, 340 F.3d at 1211.

Century Bank premises much of its discussion of the second factor on the alleged infrequency of its supervision of Plaintiffs. Specifically, the bank asserts that it never gave Villasuso comprehensive instructions on his duties after the first day. Instead, Century Bank assigned him specific tasks only on the rare occasion where a customer was not in compliance with its policies or it expected a customer after hours. For Diaz, the bank claims that his daily tasks did not change except in the occasional case where one of its employee would communicate with Diaz about a "non-routine" situation. Finally, the bank denies that any of its employees ever audited Plaintiffs' work to determine whether it was in compliance with the vendor agreement.

Plaintiffs in turn emphasize the instances where Century Bank did in fact exercise supervision over them. For Villasuso, Plaintiffs focus on the occasions where bank employees instructed him to ask a customer to remove a hat or sunglasses, or where they directed him to let a client enter after hours. For Diaz, Plaintiffs note that Estevan would call Diaz on Wednesdays to tell him when to get into position for the weekly meeting, as well as on occasions when other situations arose such as the presence of a solicitor. Additionally, Plaintiffs highlight the fact that Estevan monitored areas of the bank via camera, including the areas over which Diaz had responsibility.

Yet, even taking into account the instances where Century Bank exercised concrete supervision over Plaintiffs, the Court finds that these occasions did not rise to the level necessary to suggest joint employment. Indeed, the Eleventh Circuit reached a similar conclusion in

*Layton* despite the fact that DHL exercised as much, if not more, supervision over the drivers than Century Bank exercised in this case. In *Layton*, the court observed that the drivers loaded their trucks each morning at a DHL warehouse under the oversight of DHL managers who at times criticized the drivers' loading techniques. *Layton*, 686 F.3d at 1179. DHL also audited the drivers' vehicles and uniforms to ensure compliance with the standards contained in the agreement between DHL and Sky Land. *Id.* Lastly, DHL would occasionally contact the drivers via scanners when non-routine situations arose. *Id.*

In this case, Century Bank only periodically instructed Plaintiffs on their tasks once it had provided them with general instructions on their jobs on their respective starting dates. As in *Layton*, much of Century Bank's communication with Plaintiffs came intermittently as non-routine situations arose, such as the presence of a solicitor or the arrival of a client after hours. Nor does the record suggest that Century Bank engaged in consistent auditing of Plaintiffs' work to confirm compliance with the vendor agreement. Plaintiffs were therefore largely unsupervised during most of their workdays. Consequently, the Court finds that Century Bank's infrequent assertions of minimal oversight over Plaintiffs do not indicate the existence of a joint employment relationship.

3. Century Bank's Right to Hire, Fire, or Modify Plaintiffs' Employment Conditions

Century Bank adamantly denies that it had any right to hire, fire, or modify Plaintiffs' employment conditions. In fact, IRR alone hired and fired Plaintiffs. Though Plaintiffs acknowledge that Century Bank did not have the power to hire or fire them, they nonetheless contend that the bank could effectively modify their employment conditions by refusing their presence at the Doral location.

-14-

With Plaintiffs' admission that Century Bank had no right to hire or fire them, the Court finds that this factor is not probative of a joint employment relationship. Even if Century Bank's unexercised right to refuse a particular officer at the Doral location constituted an ability to modify Plaintiffs' employment conditions, the Court finds this power to be limited. Though Century Bank could affect Plaintiffs' ability to work at its offices, the bank could not modify Plaintiffs' employment if IRR assigned them to work for another client. Century Bank's ability to modify Plaintiffs' employment conditions thus extended only as far as IRR's initial decision to assign them to the bank. This sort of minimal involvement with the employment process does not suggest joint employment.

4. Century Bank's Power to Determine Plaintiffs' Pay Rates or Methods of Payment

Century Bank also denies that it had any power whatsoever to determine Plaintiffs' pay rates. In doing so, the bank cites the provisions of the vendor agreement granting IRR the authority to set Plaintiffs' hourly rate. IRR additionally provided Plaintiffs with time sheets to record their hours and would pay Plaintiffs directly. It would then invoice the bank for those hours worked.

While Plaintiffs admit that Century Bank did not directly determine their pay rates, they insist that the amount of their compensation, as the product of an hourly rate, was dependent upon the bank's determination of their work hours. Thus, in their estimation, Century Bank set a pay ceiling.

The Court does not find Plaintiffs' reasoning here convincing. Quite simply, Century Bank's ability to determine Plaintiffs' hours was not the power to determine Plaintiffs' pay rates or the methods of payment. The vendor agreement specifically granted IRR alone the power to

-15-

determine the pay rates for its security officers and designated the process through which IRR would bill Century Bank for the services provided. This factor therefore weighs against a finding of joint employment.

### 5. Century Bank's Preparation of Payroll and Payment of Plaintiffs' Wages

It is undisputed that IRR alone was directly responsible for both the preparation of payroll and the payment of Plaintiffs' wages. Indeed, Plaintiffs do not attempt to tie Century Bank to either activity apart from offering the same "pay ceiling" argument that they employed in relation to the previous joint employment factor regarding pay rates and methods of payment. As a result, the Court finds that this factor too weighs against a finding of joint employment.

### 6. Century Bank's Ownership of the Facilities Where Plaintiffs' Work Occurred

The ownership of the facilities where an employee's work occurred is significant because "without the [facilities], the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." *Antenor*, 88 F.3d at 937. More fundamentally, "a landowner is thought to have some knowledge of and control over what happens on his land." *Layton*, 686 F.3d at 1180.

In this case, Century Bank emphasizes that it merely leased the facilities at its Doral location and that employees and customers of neighboring businesses frequently used the adjacent parking lot. Although Plaintiffs acknowledge that Century Bank did not own the building at the Doral location, they stress the bank's control over the facilities through its lease.

While it is true that Century Bank did not own the facilities at its Doral location, it certainly exercised a considerable amount of control over its workplace through its lease.

-16-

Plaintiffs thus appropriately distinguish the present case from *Layton* where the drivers spent the majority of their workdays in vans independently owned by Sky Land. *See id.* The court in that case accordingly held that the drivers were not dependent on DHL to provide them with the facilities necessary to carry out their duty of delivering packages. *Id.* In contrast, Plaintiffs relied upon Century Bank's control of its Doral location to carry out their duty of providing security at the bank, thereby suggesting a greater level of dependence on the putative employer here than existed in *Layton*. This factor therefore may weigh somewhat in favor of a joint employment relationship.

      7. Plaintiffs' Performance of a Specialty Job Integral to Century Bank's Business

      In *Rutherford Food Corp. v. McComb*, the Supreme Court concluded that a slaughterhouse was the joint employer of meat boners whom it had hired via a labor contractor. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947). The Court found that the workers performed "a specialty job on the production line" more akin to "piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." *Id.* at 730. Since the workers stood as "part of the [slaughterhouse's] integrated unit of production," the Court deemed them to be the slaughterhouse's employees. *Id.* at 729. The Eleventh Circuit has subsequently explained that "a worker who performs a routine task that is a normal and integral phase of the [alleged employer]'s production is likely to be dependent on the [alleged employer]'s overall production process." *Antenor*, 88 F.3d at 937.

      Century Bank now maintains that Plaintiffs did not perform a specialty job integral to its business. Returning to *Layton*, the bank observes that the Eleventh Circuit declined to consider the drivers' "crucial task" of delivering packages as "integral" since it was not analogous to

employees working on a production line. *See Layton*, 686 F.3d at 1180. Century Bank thus argues that Plaintiffs' service as security officers was likewise not integral to the bank's operation despite its crucial nature. Plaintiffs nonetheless object to the bank's characterization of their role within the bank's larger operation. They contend that their position as security officers was a specialized and critical aspect of the integrated unit of the bank's business.

Though security services are without doubt a crucial aspect of a bank's business, Plaintiffs as security officers did not perform a specialty job integral to Century Bank's business in the sense of an employee "working at a particular position on a larger production line." *Id.* (quoting *Antenor*, 88 F.3d at 937). In fact, Plaintiffs' case is less compelling than the drivers' position in *Layton* where DHL could not accomplish its essential business task of delivering packages without them. Though a bank certainly needs security officers for protection, those officers are not directly involved in the business of banking and are largely ancillary to a bank's daily activities. The Court therefore finds that this factor is not probative of joint employment.

8. Century Bank's and IRR's Relative Investment in Equipment and Facilities

Courts look to the contractor's and the putative employer's relative investment in equipment and facilities because "workers are more likely to be economically dependent on the person who supplies the equipment or the facilities." *Id.* at 1181. Since IRR alone provided Plaintiffs with the company identification cards and the uniform patches bearing its name, Century Bank contends that it has not made any investment in Plaintiffs' equipment. Plaintiffs counter by asserting that Century Bank controlled and supplied the facilities in the Doral location.

Because both IRR and Century Bank made investments in the form of equipment and

-18-

facilities respectively, the Court finds that this factor does not aid its overall analysis. In *Layton*, the court did not find this final factor to be useful where both DHL and Sky Land invested significantly in the drivers' equipment and facilities. *Id.* In particular, DHL contributed the warehouses where the drivers worked briefly each day while Sky Land owned the vans that the drivers used for the majority of their workdays. *Id.* Similarly, the Court does not find this factor to be helpful where both IRR and Century Bank invested in Plaintiffs' equipment and facilities.

### 9. Other Considerations

The Court notes one further consideration that weighs against a finding of joint employment. As a further factor in evaluating the economic reality of an alleged employment relationship, the Eleventh Circuit has also considered whether the alleged employer "maintained employment records." *Villareal v. Woodman*, 113 F.3d 202, 205 (11th Cir. 1997). Here, Century Bank failed to create or maintain any of Plaintiffs' employment records beyond the invoices and the attached time sheets that IRR sent when billing the bank.

### B. Final Assessment

Based on the record and the absence of a genuine issue of material fact, the Court concludes as a matter of law that Century Bank was not Plaintiffs' joint employer under the FLSA. Recalling the Eleventh Circuit's guiding principles for the joint employment analysis, the Court finds that the economic reality of the present circumstances demonstrates little, if any, economic dependence by Plaintiffs on Century Bank. Though the bank instructed Plaintiffs on "macro-level goals," it failed to provide much instruction regarding daily tasks on a consistent basis. *See Layton*, 686 F.3d at 1181 (concluding that DHL was not the drivers' joint employer where the company "provided little guidance regarding the manner by which to execute daily

tasks"). Century Bank's minimal control and supervision of Plaintiffs, paired with its minor role in Plaintiffs' employment process and lack of involvement in the payment of Plaintiffs, all suggest the absence of a joint employment relationship.

Perhaps most indicative of the lack of this joint relationship is the fact that IRR had plenary authority over the assignment of Plaintiffs, not only in rotating them between different Century Bank locations, but also in the transfer of Plaintiffs to other clients. In truth, IRR originally transferred Diaz from service at a condominium to his assignment at the bank. Accordingly, the Court notes that the Eleventh Circuit in *Layton* emphasized Sky Land's ownership of the vans as an indication of the fact that the drivers could have worked as couriers for other companies. *See id.* at 1180. As a reflection of economic dependence then, the Court finds that this fact, in conjunction with the other factors discussed, demonstrates Plaintiffs' lack of economic dependence on Century Bank. Consequently, the Court grants Century Bank's motion for summary judgment and denies Plaintiffs' motion for partial summary judgment.

### IV. CONCLUSION

For the above reasons, it is

**ADJUDGED** that Defendant U.S. Century Bank's Motion for Summary Judgment **(D.E.**

No. 34), filed on __February 2, 2013__, is GRANTED, and that Plaintiffs' Motion for Partial

Summary Judgment **(D.E. No. 35)**, filed on __February 5, 2013__, is DENIED.


DONE AND ORDERED in Chambers at Miami, Florida, this ___ day of May, 2013.


_____

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record